**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BACILIO RUIZ TORRES; JOSE
AMADOR, on behalf of
themselves and all other
similarly situated persons,
*Plaintiffs-Appellees*,

v.

MERCER CANYONS INC.,
*Defendant-Appellant.*

No. 15-35615

D.C. No.
1:14-cv-03032-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Stanley Allen Bastian, District Judge, Presiding

Argued and Submitted July 8, 2016
Seattle, Washington

Filed August 31, 2016

Before: A. WALLACE TASHIMA, and MILAN D.
SMITH, JR., Circuit Judges, and LESLIE E.
KOBAYASHI,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Leslie E. Kobayashi, United States District Judge for
the District of Hawaii, sitting by designation.

## SUMMARY[**]

---

### Labor Law / Class Certification

The panel affirmed the district court's order certifying a plaintiff class of domestic farm workers who alleged violations of the Agricultural Workers' Protection Act and Washington law.

The plaintiffs alleged that the defendant farm employer failed to inform them of the availability of agricultural work that was performed by temporary foreign workers under the federal H-2A visa program, and failed to pay domestic workers the same wage as the foreign workers.

The panel affirmed the district court's certification of an Inaccurate Information class and an Equal Pay subclass. The panel held that as to the Inaccurate Information class, the district court did not abuse its discretion in finding common questions under Fed. R. Civ. P. 23(a)(2) regarding a duty to disclose information pertaining to H-2A jobs, nor in finding that common issues predominated under Rule 23(b)(3). The panel also affirmed the district court's findings of commonality and typicality with regard to the Equal Pay subclass, as well as the district court's finding of typicality under Rule 23(a)(4).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Eric D. Miller (argued), Michael T. Reynvaan, Frederick B. Rivera, and William B. Stafford, Perkins Coie LLP, Seattle, Washington, for Defendant-Appellant.

Lori Jordan Isley (argued), Joachim Morrison, and David Solis, Columbia Legal Services, Yakima, Washington; Adam J. Berger and Martin S. Garfinkel, Schroeter Goldmark & Bender, Seattle, Washington; for Plaintiffs-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

Defendant Mercer Canyons, Inc. (Mercer) appeals the district court's order certifying a class of domestic farm workers, represented by Bacilio Ruiz Torres and Jose Amador (collectively, Plaintiffs). Mercer operates a fruit and vegetable farm near Prosser, Washington. In 2013, Mercer participated in the federal H-2A program, which permitted Mercer to hire foreign workers to fill temporary agricultural positions at an hourly wage of $12.

Plaintiffs brought a putative class action, claiming that Mercer had a common policy or practice of failing to inform domestic farm workers of the availability of H-2A work that paid $12 per hour, in violation of the Agricultural Workers' Protection Act (AWPA), 29 U.S.C. §§ 1831(e) and 1821(f), and the Washington Consumer Protection Act (CPA), Wash. Rev. Code § 19.86.020. In addition, Plaintiffs alleged that Mercer failed to pay its own domestic workers $12 per hour

4          RUIZ TORRES V. MERCER CANYONS

when they carried out the same tasks as foreign H-2A workers, in violation of AWPA and state wage laws.

The district court certified an Inaccurate Information class and an Equal Pay subclass, corresponding to Plaintiffs' claims. We affirm the district court's class certification order.

## FACTS AND PRIOR PROCEEDINGS

### A. Background

Mercer applied for, and was granted, permission to hire temporary foreign workers under the federal H-2A program in order to supplement its workforce for the 2013 season. In February 2013, the Department of Labor issued Mercer a Clearance Order, which described the terms and conditions of Mercer's participation in the H-2A program. Among other things, the Clearance Order allowed Mercer to employ up to 44 foreign workers for temporary vineyard work from March 24 to September 1, 2013. It also listed the specific types of tasks the H-2A workers would perform, along with the hourly wage they would receive ($12).

One of the conditions of its involvement in the H-2A program obligated Mercer to recruit domestic labor to minimize the number of foreign workers filling the 44 available positions. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex. rel. Barez*, 458 U.S. 592, 596 (1982). Specifically, Mercer was required to engage in the "positive recruitment" of domestic workers from February 4 to March 21, 2013 through routine recruitment practices, such as telling former employees about H-2A jobs and "solicit[ing] their return." 20 C.F.R. § 655.135(c), 655.150–154, 655.158. Furthermore, Mercer was required to hire any qualified domestic worker

who applied for H-2A work, a requirement that continued through the first half of the contract period, in this case, until June 15, 2013. *See* 20 C.F.R. § 655.135(a) & (d).

In 2013, Mercer maintained a call-back list to keep track of workers who walked in seeking employment. The list, entitled an "Employment Information Form," allowed prospective applicants to provide their names, phone numbers, whether they had a driver's license, and relevant skills or experience so Mercer could "contact [them] for future employment opportunities." During the 45-day positive recruitment period, almost 200 people entered their information on this list.

Ultimately, Mercer hired only 22 domestic workers for the H-2A program. Some workers were hired through an organization called WorkSource, which provided job referrals. Of the remaining 22 positions available under the H-2A program, Mercer hired only 19 foreign workers. Those 19 workers arrived on May 2, 2013. Their H-2A contract originally ran until September 1, 2013, but was extended two weeks, until September 15, 2013.

During the course of the H-2A program, Mercer realized that additional labor was needed because the H-2A employees were not completing the work fast enough. As a result, Mercer used its own domestic workers to perform some H-2A tasks, such as grapevine tying. It also sought the services of a labor contractor, M&L, which brought in 44 more domestic workers to help with H-2A tasks. Mercer was required to provide a copy of the terms of the work contract or Clearance Order to any worker who performed qualifying H-2A work during the contract period. *See* 20 C.F.R. §§ 655.122(q); 655.103(b) (defining "corresponding employment"). In

addition, all H-2A workers, including any employees performing qualifying H-2A tasks, were entitled to the same wages of $12 per hour. *See* 20 C.F.R. §655.122(a).

## B. Ruiz Torres and Amador

Ruiz Torres and Amador are domestic farm workers. Ruiz Torres was a vineyard worker at Mercer in 2012. Ruiz Torres later returned to work at Mercer from January 8 to September 6, 2013. During this period, Ruiz Torres claims to have performed some qualifying H-2A work in Mercer's vineyards. He alleges that he was sometimes paid $12 an hour for this work, and sometimes not. Mercer did not provide Ruiz Torres with either a copy of the Clearance Order or a written work contract. Neither did it inform him about available H-2A work paying $12 per hour.

On March 19, 2013, during the positive recruitment period, Amador walked into Mercer's front office with his wife and father-in-law. All three were looking for seasonal farmwork in Mercer's vineyards. Mercer did not tell Amador about the availability of H-2A work for $12 per hour. Instead, the front-office staff informed him that "the chances of getting jobs were really low until the people from . . . Mexico arrived, and they would have to see how many spots were open." Ultimately, Amador decided that he would not sign the employment call-back list, although his wife and father-in-law did. Mercer did not contact any of them about employment opportunities.

## C. Procedural History

Plaintiffs brought a putative class action in the Eastern District of Washington, alleging that Mercer failed "to inform

local farm workers about the availability of $12 an hour vineyard labor jobs." According to Plaintiffs, Mercer's failure to disclose violated AWPA, 29 U.S.C. §§ 1831(e) and 1821(f), and the CPA, Wash. Rev. Code § 19.86.020. In addition, Plaintiffs claimed that Mercer failed to pay its domestic workers $12 per hour for qualifying H-2A work, in violation of AWPA, 29 U.S.C. § 1832(a), and 1822(a), and Washington wage law, Wash. Rev. Code § 49.52.050.

Mercer moved for summary judgment on Plaintiffs' individual claims under AWPA, the CPA, and Washington state wage laws. The district court denied summary judgment. It further denied Mercer's motion for reconsideration, and Mercer's request to certify the summary judgment order for interlocutory appeal.

Subsequently, Plaintiffs moved to certify an Inaccurate Information class and an Equal Pay subclass. The Inaccurate Information class, numbering approximately 600 individuals, includes the following members:

> All domestic migrant and seasonal farm workers who: 1) were employed as vineyard workers by Mercer Canyons in 2012; 2) sought employment at Mercer Canyons in 2013 between February 4 and June 15, 2013; or 3) performed vineyard work at Mercer Canyons between March 24 and September 15, 2013, and were not referred by WorkSource.

Within this class, Plaintiffs identified an Equal Pay subclass, *see* Fed. R. Civ. P. 23(c)(5), of approximately 200

individuals. This subclass is comprised of the following members:

> All domestic and seasonal farm workers who performed vineyard work between March 24 and September 15, 2013 for Mercer Canyons, were paid less than $12 per hour, and were not referred by WorkSource.

The district court granted Plaintiff's motion for class certification, and appointed Ruiz Torres and Amador as class representatives. This timely appeal followed.

## STANDARD OF REVIEW AND JURISDICTION

We have jurisdiction pursuant to 28 U.S.C. § 1292(e). We review the district court's class certification order for abuse of discretion and the findings of fact upon which it relied for clear error. *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014). "An abuse of discretion occurs when the district court . . . relies upon an improper factor, omits consideration of a factor entitled to considerable weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1018 (9th Cir. 2011) (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010)). When reviewing an order granting class certification, "we accord the district court noticeably more deference than when we review a denial." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013) (quoting *Wolin*, 617 F.3d at 1171).

## ANALYSIS

Rule 23 sets forth a series of pre-requisites to class certification, including the existence of (1) "questions of law or fact common to the class," and (2) "claims or defenses of the representative parties . . . typical of the claims of defenses of the class." Fed. R. Civ. P. 23(a)(2), (a)(4). Rule 23(b)(3), applicable here, additionally requires that common questions of law or fact found under Rule 23(a)(2) "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

On appeal, Mercer raises numerous challenges to the district court's certification decision. In particular, it contends that the district court found common issues where there were none. Next, it contends that the district court abused its discretion by finding that these common issues predominated. Finally, it challenges the district court's finding that Ruiz Torres and Amador's claims and defenses were typical of those of the class. We address each of these arguments in turn.

## I.  Inaccurate Information class

### A.  Rule 23(a)(2) commonality

"What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). To satisfy Rule 23(a)(2) commonality, "'[e]ven a single [common] question' will do." *Id*. at 359 (quoting Richard A.

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

In finding commonality within the Inaccurate Information class, the district court identified two related common questions it believed would drive the resolution of the litigation:

> (1) "Whether Mercer Canyons had a policy or practice to withhold information pertaining to H-2A jobs from job-seekers and current employees"

> (2) "Whether such withholding constituted providing false or misleading information concerning the existence of, or terms and conditions of, jobs . . . under the AWPA and CPA."

Mercer argues that the district court "committed a per se abuse of discretion by misinterpreting the substantive law governing plaintiffs' claims, which led it to divine common issues." This is essentially the same argument made by Mercer in its motion for summary judgment, wherein it asserted that AWPA imposes no such disclosure duty concerning H-2A work. To resolve this question at the class certification stage would provide Mercer the sort of interlocutory review of the summary judgment order that the district court had declined to certify.

Instead, we consider merits questions at the class certification stage only to the extent they are relevant to whether Rule 23 requirements have been met. *Stockwell v. City of S.F.*, 749 F.3d 1107, 1113 (9th Cir. 2014). With this

principle in mind, we conclude that the district court did not abuse its discretion by identifying the existence of a legal issue common to the class. The district court found that one reading of the relevant statutes supports the existence of a disclosure duty, and that an answer to this threshold question would drive the resolution of the litigation. Without such a duty, the claims of the class as a whole would fail. With it, Plaintiffs would clear a significant legal hurdle.

In particular, the district court focused on Sections 1831(e) and 1821(f) of AWPA. Section 1831 relates to seasonal agricultural workers, while Section 1821 concerns migrant agricultural workers. These two provisions exhibit significant parallels, and the language of § 1831(e) is nearly identical to that of § 1821(f).[1] Section 1831(e) states:

> No farm labor contractor, agricultural employer, or agricultural association shall knowingly provide false or misleading information to any seasonal agricultural worker concerning the terms, conditions, or existence of agricultural employment required to be disclosed by subsection (a), (b), or (c) of this section.[2]

---

[1] The text of Section 1821(f) differs from Section 1831(e) in two respects, neither of which is material here. First, it refers to subsections "(a), (b), (c), or (d)" of that provision because Section 1821 includes an additional subsection concerning disclosure requirements for housing providers. In addition, it substitutes the word "seasonal agricultural worker" for "migrant agricultural worker."

[2] Subsections (a), (b), and (c) of § 1831 deal with written disclosure requirements, posting requirements, and recording keeping requirements imposed on employers of agricultural workers.

In construing the meaning of AWPA's reference to "false or misleading information," the district court considered a separate, but related, set of regulations concerning an employer's duties under the H-2A program, *see, e.g.*, 20 C.F.R. §§ 655.122, 655.135, 655.153, and determined that AWPA's prohibition on the provision of "false or misleading information," 29 U.S.C. §§ 1831(e), 1821(f), could include a material omission. For the purposes of class certification, we need not presently decide whether Plaintiffs' construction of Sections 1831(e) and 1821(f) of AWPA is correct, only that it raises a common legal question.

Mercer counters that since H-2A positions are not specifically referenced in AWPA, such positions are not "required to be disclosed," and therefore fall outside the scope of the statute. That argument is susceptible of class-wide resolution. While we do not here decide the common question, we agree with the district court that Mercer's failure to disclose "information pertaining to H-2A jobs," such as the existence or pay-rate of such work, may constitute "false or misleading" information, and therefore poses a common question of liability.

Moreover, the district court identified a related question of fact. Plaintiffs presented evidence that Mercer had a "common policy or practice of withholding information pertaining to H-2A jobs from job-seekers and current employees." The answer to this question, too, will help to drive the resolution of the litigation for all class members. *See Jiminez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165–66 (9th Cir. 2014) (holding that "[p]roving at trial whether such informal or unofficial policies existed" would drive the resolution of class claims).

## B. Rule 23(b)(3) predominance

The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones. For purposes of this analysis, "[a]n individual question is one 'where members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, 196–97 (5th ed. 2012)).

Predominance is not, however, a matter of nose-counting. *Jiminez*, 765 F.3d at 1165. Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class. It is an assessment of "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quotations omitted).

### 1. Common proof of injury under the CPA

Mercer's primary challenge to predominance is that the district court erred concerning the elements of a CPA claim under Washington law. Specifically, Mercer claims that "[the district court] failed to appreciate that . . . injury is an element of [CPA] liability, not just a component of damages." Here, the district court did not commit such a clear legal misstep. Rather, it acknowledged that a CPA claim requires the following five elements:

(1) an unfair or deceptive act or practice;

(2) which occurs in trade or commerce;

(3) that impacts the public interest;

(4) which causes injury to the plaintiff in his or her business or property; and

(5) which injury is causally linked to the unfair or deceptive act.

*See Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 858 P.2d 1054, 1061 (Wash. 1993) (en banc).

The district court then weighed whether common issues predominate within the Inaccurate Information Class. First, it noted that Plaintiffs could satisfy at least the first three CPA elements by "proving the common questions." It then remarked that any individualized questions raised by Mercer "nearly all go to the issue of damages rather than liability." Thus, it concluded that predominance was not defeated, notwithstanding the existence of some individualized questions.

Because this reasoning does not reveal an error of law concerning the kinds of factors to be weighed, Mercer must rely on the claim that the district court "mull[ed] the correct mix of factors but [made] a clear error of judgment in assaying them," *Stearns*, 655 F.3d at 1018 (quotations omitted). But the district court recognized that important questions, regarding the existence of a common policy of non-disclosure, and whether such non-disclosure constituted false and misleading information, would "drive the

resolution" of the AWPA and CPA claims. *Wal-Mart*, 654 U.S. at 350. Considered in light of these core claims, the district court did not abuse its discretion by concluding that the existence of some individualized issues did not overwhelm an overall finding of predominance.

### 2. "Informational" injury

Moreover, it is not clear that Plaintiffs' showing of "injury" under the CPA would necessarily be wholly individualized. Plaintiffs characterize their injury as an informational one. This informational injury, they claim, stems from a common policy of non-disclosure by Mercer. As a result of this non-disclosure, class members were deprived of the opportunity to pursue H-2A work at $12 per hour.

The CPA is a remedial statute that defines "injury" liberally to include when "the plaintiff's property interest or money is diminished . . . even if the expenses caused by the statutory violation are minimal." *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 892 (Wash. 2009) (en banc) (quotations omitted). "[T]he injury involved need not be great, or even quantifiable." *Ambach v. French*, 216 P.3d 405, 407 (Wash. 2009) (en banc). Rather, the limitation that a defendant's conduct cause injury in "business or property" has only been deployed to exclude suits for personal injury and emotional distress. *See Wash. State Physicians Ins. Exch.*, 858 P.2d at 1063.

Under Plaintiffs' theory, an individual may experience "injury" under the CPA if, for example, Mercer's omission causes her to expend time or resources looking for other jobs. In this manner, informational injury need not result in direct pecuniary loss, although it may do so. *See Panag*, 204 P.3d at

900; *Handlin v. On-Site Manager*, Inc., 351 P.3d 226, 230 (Wash Ct. App. 2015) (holding that "consumer disclosures mandated by the [state Fair Credit Reporting Act] are a form of property," and that "sufficient injury is therefore pleaded if a plaintiff alleges that she was deprived of the use of her property for even a short amount of time"). Moreover, a reasonable fact finder could conclude that, but for Mercer's alleged policy of non-disclosure, class members would have had the opportunity to seek H-2A work at the $12 hourly rate.[3] *See Schnall v. AT&T Wireless Servs.*, *Inc.*, 259 P.3d 129, 137 (Wash. 2011) (adopting a "proximate cause standard" for causation under the CPA).

In contrast, Mercer interprets the nature of the alleged "injury" more narrowly as being deprived of an H-2A job. Mercer reasons that to show injury, one must demonstrate eligibility for an H-2A job. Such a reading relies on an unduly narrow conception of "injury." Under the CPA, an injury resulting from non-disclosure may include being denied the opportunity to apply for an H-2A job. For similar reasons, Plaintiffs' theory of liability does not depend on a class member's immigration status.[4] Under the informational injury theory, a class member's status is irrelevant at the liability phase, so long as she was denied the opportunity to apply for a job as a result of Mercer's policy of omission. The separate question of actual *damages* will hinge on the amount of harm caused by class members' being deprived of the opportunity

---

[3] WorkSource referrals are excluded from the class definition, as the referred individuals were presumably informed about available H-2A jobs.

[4] Mercer initially sought discovery concerning the immigration status of the lead plaintiffs. The district court denied Mercer's motion to compel and issued a protective order.

to pursue those jobs. The presence of individualized damages calculations, however, does not defeat predominance. *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013).

### 3.   The presence of "non-injured" class members

Even crediting Plaintiffs' theory of injury, Mercer falls back on the argument that "a class cannot be certified if it contains both injured and non-injured parties." We find this argument unpersuasive for several reasons.

First, Mercer's statement is inaccurate, as even a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct. *See Newberg on Class Actions* § 2:3; *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification.").

Mercer's claim that the presence of certain "non-injured" individuals within the Inaccurate Information class defeats predominance is also mistaken. Empirically, Mercer contends that the class is too broad because it includes a subset of people exposed to—yet ultimately not harmed by—a policy of non-disclosure. This merely highlights the possibility that an injurious course of conduct may sometimes fail to cause injury to certain class members. However, it fails to reveal a flaw that may defeat predominance, such as the existence of large numbers of class members who were never *exposed* to the challenged conduct to begin with. *See Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 596 (9th Cir. 2012); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068–69 (9th Cir. 2014). Mercer's remaining challenges concern the

overbreadth of the class definition. Yet the class definition is reasonably co-extensive with Plaintiffs' chosen theory of liability. Ultimately, Mercer's argument reflects a merits dispute about the scope of that liability, and is not appropriate for resolution at the class certification stage of this proceeding.

### a. Empirical overbreadth

Mercer contends that, even if a common policy or practice of non-disclosure existed, it did not result in injury to certain class members. That is not because they were not subject to the challenged practice in the first place. Rather, it is Mercer's contention that those class members, even had Mercer provided them with the omitted H-2A job information, would not have been any better off because they were not looking for work at the time, would not have been ultimately hired by Mercer, or for other individualized reasons. Mercer's examples each highlight the potential for unlawful conduct in the absence of harm.[5] We conclude that such fortuitous non-injury to a subset of class members does not necessarily defeat certification of the entire class, particularly as the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition. *See Newberg on Class Actions* § 2:3.

This stands in contrast to the situation in *Mazza*, where many class members were not injured by virtue of the fact

---

[5] In only two cases did Mercer identify putative class members, former employees Sandra Blanco and her sister Genoveva Guzman, who were affirmatively contacted about available work by Mercer. Mercer does not indicate, however, that the advertised work concerned the H-2A positions.

that they "were never exposed to the allegedly misleading advertisements." 666 F.3d at 597. In *Mazza*, the defendant subjected only a small segment of an expansive class of car buyers to misleading material as part of a "very limited" advertising campaign. *Id*. at 595. Under those circumstances, we found that Rule 23 predominance was defeated, since "it was unreasonable to assume that all class members purchasing cars had seen the potentially misleading ads." *Id.* at 596. That is not the situation here, where the existence of a common policy or practice, if proven, is evidence that the class as a whole was exposed to purportedly misleading omissions about H-2A jobs.[6]

Mercer counters that whether the omission was misleading, and therefore injurious, will "turn on the minutia of individual interactions and circumstances" between Mercer and class members. However, Mercer has not shown that the class as a whole was exposed to "disparate information from various representatives of the defendant," *Stearns*, 655 F.3d at 1020, creating materially different impressions about the availability of H-2A work. Rather, the conduct at issue is reasonably uniform as the crux of Plaintiffs' legal challenge

---

[6] *Mazza* quotes a Second Circuit decision stating that "no class may be certified that contains members lacking Article III standing." *Mazza*, 666 F.3d at 594 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). However, that statement taken in context signifies only that it must be possible that class members have suffered injury, not that they did suffer injury, or that they must prove such injury at the certification phase. *See Denney*, 433 F.3d at 263–64 ("We do not require that each member of a class submit evidence of personal standing . . . . [Rather], the class must . . . be defined in such a way that anyone within it would have standing."); *see also Stearns*, 655 F.3d at 1021 ("At least one *named* plaintiff must satisfy the actual injury component of standing in order to seek relief on behalf of himself or the class."); *Bates v. United Parcel Serv., Inc*., 511 F.3d 974, 985 (9th Cir. 2007) (en banc).

involves a common failure to disclose information, and not merely a disparate series of affirmative statements. Accordingly, the district court did not abuse its discretion in concluding that whether a class-wide policy or practice of non-disclosure existed was a common question of fact that "predominates over the exact interaction between individual job-seekers and Mercer."

In sum, pursuant to Rule 23, "the court's task at certification is to ensure that the class is not 'defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'" *Newberg on Class Actions* § 2:3 (quoting *Messner*, 669 F.3d at 824). We are satisfied that condition is met here.

### b.  Definitional overbreadth

Mercer's challenge also stems from an underlying concern that the class was drawn too broadly, perhaps in the interest of inclusion of all individuals who had potential damages claims under AWPA and the CPA. This potential flaw, however, is not fatal to certification. Mercer's dispute merely reflects the existence of contrasting litigation positions on the proper scope of liability, and a merits issue that the district court will later resolve concerning the breadth of Mercer's disclosure duty over time.

For now, Plaintiffs need not downsize their legal theory that Mercer had a disclosure duty toward all members of the class, in favor of a duty to target only those most likely to be

interested.**[7]** What is critical is that Plaintiffs' theory of informational injury, through Mercer's failure to disclose H-2A job information to those it typically recruited or used for H-2A work, actually maps onto the membership of the class. In other words, class membership must fit the theory of legal liability.

We conclude that the composition of the Inaccurate Information class meets this requirement, given the underlying legal framework upon which Plaintiffs rely. Notably, none of the relevant disclosure regulations varies on its face according to the existing knowledge or interest of the worker. For example, an employer of seasonal or migrant workers must contact former domestic workers "employed by the employer in the occupation at the place of employment during the previous year and solicit their return." 20 C.F.R. § 655.153. This regulation corresponds to the portion of the class definition that includes those "employed as vineyard workers by Mercer Canyons in 2012."

In addition, the class definition includes those seasonal and migrant workers who "sought employment at Mercer Canyons in 2013 between February 4 and June 15, 2013."**[8]**

---

**[7]** Indeed, defining the class to include only those individuals who were "injured" by non-disclosure threatens to create a "fail safe" class, one that is defined so narrowly as to "preclude[] membership unless the liability of the defendant is established." *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010). As a result, we require no more than a reasonably close fit between the class definition and the chosen theory of liability.

**[8]** Mercer also challenges the accuracy of the employment call-back list, which Plaintiffs used to identify those class members who "sought employment." It notes that the list contains some Mercer customers who

This part of the definition maps onto Mercer's positive recruitment and hiring obligations during this interval. *See* 20 C.F.R. § 655.154 (requiring an employer to engage in "method(s) of "positive recruitment" "no less than the normal recruitment efforts of non-H-2A agricultural employers"); 20 C.F.R. § 655.135(a) & (d) (requiring an employer to hire all qualified domestic applicants up through the first half of the contract period). As a result, this definition tracks the group of job-seekers who were subject to, and therefore could be harmed by, Mercer's allegedly unlawful failure to disclose.

The class definition also includes those domestic workers who "performed vineyard work at Mercer Canyons between March 24 and September 15, 2013." Because H-2A work encompassed many vineyard tasks such as vine-tying, Plaintiffs contend that those who performed vineyard work during the contract period were entitled to H-2A job information pursuant to the regulations. *See* 20 C.F.R. § 655.122(q) (requiring an employer to disclose the terms of the work contract to workers engaged in qualifying H-2A work during the contract period); § 655.103(b) (defining "corresponding employment").

The composition of the Inaccurate Information class, as reflected in these definitions, reveals a reasonably close fit with Plaintiffs' theory of liability, such that Rule 23(b)(3) predominance is maintained. As a result, the membership of the class is largely co-extensive with those who could have

---

erroneously signed it. However, this is an evidentiary quibble in the guise of a challenge to the class definition. It does not bear on the salient question of whether those workers who actually "sought employment," as the class definition provides, were unlawfully denied information on H-2A jobs.

been injured by Mercer's conduct. As the case progresses, the district court may elect to separate the class into subclasses, or adjust the scope of the class definition, if it later finds that the inclusiveness of the class exceeds the limits of Mercer's legal liability under AWPA or the CPA.

Finally, Mercer identifies one minor source of over-expansiveness. Specifically, it claims that some individuals who "sought employment" at Mercer and might ostensibly fall within the class definition, were actually seeking work as tractor drivers, and thus presented unlikely candidates for H-2A vineyard work.[9] If necessary, however, the district court may construe the class definition more narrowly, or otherwise conform its interpretation of the class definition with the prevailing theory of liability. *See Messner*, 669 F.3d at 826 n.15 ("In circumstances such as these, involving minor overbreadth problems that do not call into question the validity of the class as a whole, the better course is not to deny class certification entirely but to amend the class definition as needed to correct for the overbreadth.").

## II.  The Equal Pay subclass

The district court certified an Equal Pay subclass within the Inaccurate Information class, consisting of those workers who "performed vineyard work between March 24 and September 15, 2013, were paid less than $12 per hour, and were not referred by WorkSource." With respect to this subclass, the district court identified a common question of "whether Mercer Canyon had a practice to consistently fail to

---

[9] Mercer's argument relies on the assumption that those job-seekers who listed "truck driving" as one of their skills on the employment call-back list were not also interested in pursuing H-2A work.

pay employees $12 [an hour] for corresponding Clearance Order work." It found that predominance existed because Plaintiffs planned to prove liability for underpayment in the aggregate, such that there was a common question of liability amenable to class-wide proof.

## A.  Rule 23(a)(2) commonality

Plaintiffs proposed to demonstrate class-wide liability by offering proof of underpayment in the aggregate.[10] Mercer protests that the common proof that Plaintiffs rely upon, company accounting and payroll records, is inaccurate. Rather, Mercer asserts that the records are simply accounting cost codes for it to track work in the aggregate, and do not show the actual rate at which individual employees were paid. Instead, Mercer claims that it used timecards, which reflected when an employee performed H-2A tasks. This information was then manually entered into Mercer's payroll system, so that employees were allegedly paid $12 per hour for performing corresponding work.

Whether the proffered evidence ultimately shows that Mercer failed to pay its workers touches on a central element of liability. "When, as here, the concern about the proposed class is . . . an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class

---

[10] Under the aggregate approach, Plaintiffs need not identify specific instances in which an employee was not paid $12 per hour for performing H-2A work, as long as the records show (1) the total wages that non-H-2A employees received for performing H-2A qualifying work, and (2) the total number of hours of H-2A work performed by those employees. Since H-2A work required compensation at $12 per hour, the existence of a shortfall in aggregate wages would constitute proof of underpayment.

certification." *Tyson Foods*, 136 S. Ct. at 1047 (quoting Nagareda, 84 N.Y.U. L. Rev. at 107). As a result, we conclude that the district court did not abuse its discretion by identifying a common question of fact concerning whether Mercer's domestic workers were consistently paid $12 per hour for H-2A work.

## B. Rule 23(b)(3) predominance

Mercer also claims that defending against the aggregate underpayment claims will require it to raise individualized defenses, thereby defeating predominance. Plaintiffs' approach, it argues, would result in a "Trial by Formula," without allowing Mercer to engage in individual inquiries or raise individual defenses that a particular class member was paid the proper wages.

Mercer reasons that because these defenses would not be "common to the claims made by all class members," *Tyson Foods*, 136 S. Ct. at 1047, Plaintiffs' method of common proof is deficient. *Tyson Foods* addressed the use of representative samples and statistical methods of proof. *Id.* at 1046. Here, proof is not a matter of probability—it is a matter of logic that an aggregate underpayment means that Mercer underpaid some, possibly all, subclass members. In this context, Plaintiffs' method of establishing liability for underpayment in the aggregate is a permissible means of proceeding. *See Newberg on Class Actions* § 12:2 ("[T]here is no absolute requirement in Rule 23 that aggregate damages be calculable, but where they are, they may be all that plaintiffs need to prove."). Particularly where Mercer has allegedly failed to keep adequate accounting records specific to each employee, class members may be compelled to resort to an aggregate method of proving wage underpayment. *See*

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) ("[I]t is the employer who has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed.").

Of course, the partitioning of damages among class members may lead to individual calculations. Yet those calculations would not impact a defendant's liability for the total amount of damages. *Cf. Hilao v. Estate of Marcos*, 103 F.3d 767, 786 (9th Cir. 1996) (class-action defendant's interest was "only in the total amount of damages for which it will be liable," not "the identities of those receiving damage awards"). In wage-and-hour disputes, such individualized damages inquiries are common, and typically do not defeat certification. *Leyva*, 716 F.3d at 513–14.

### III.     Rule 23(a)(4) typicality

The test of typicality serves to ensure that "the interest of the named representative aligns with the interests of the class.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).[11] "Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need

---

[11] As the *Wal-mart* Court noted, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." 131 S. Ct. at 2551 n.5 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 (1982)).

not be substantially identical." *Parsons*, 754 F.3d at 685 (quotations omitted). In this context, "typicality refers to the nature of the claim or defense . . . and not to the specific facts from which it arose or the relief sought." *Id*. Measures of typicality include "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.3d at 508.

The district court found that the typicality requirement was met in this case. Mercer raises several arguments to the contrary. First, Mercer emphasizes that the class definition includes both "seasonal and migrant farm workers," whereas Amador and Ruiz Torres are only seasonal farm workers. Mercer has not articulated how this would make a substantive difference in the prosecution of the AWPA and CPA claims. In fact, AWPA's disclosure provision regarding seasonal workers, 29 U.S.C. § 1821(f), is nearly identical to the one involving migrant workers, 29 U.S.C. §1831(e). *See supra* note 2. Nor does the CPA draw any such distinctions.

Next, Mercer notes that some of the workers performing H-2A tasks were hired through a labor contractor, M&L, whereas Ruiz Torres was directly hired by Mercer. However, both allegedly experienced the same informational harm of not being told about H-2A work paying $12 per hour, and the harm of wage underpayment after performing qualifying H-2A work. Moreover, for the equal pay claims, both must prove that Mercer was an "employer" within the meaning of federal and state labor law. *See* 29 U.S.C. § 1802(2), (5); Wash. Rev. Code § 49.46.010(2), (4). The M&L workers might also claim that M&L was a joint employer. Yet the district court did not abuse its discretion when it concluded

that "the nature of the claim would appear to be the same even if one additional question would need to be answered" for the M&L workers.

Mercer further contends that Ruiz Torres is not a typical "former employee," since he is a former employee who later returned to perform a non-H-2A job at Mercer. However, he claims to have suffered the same class-wide harm of not being told about the available H-2A work, and falls squarely into the class of workers who allegedly performed H-2A tasks for less than $12 per hour. Therefore, his claims are sufficiently typical of that of the class.

Finally, Mercer argues that Amador is an atypical representative for the Inaccurate Information class because he never signed the call-back list when he visited seeking work. Amador explained he was so discouraged upon learning that H-2A jobs were being held for foreign workers that he decided not to leave his contact information. Nonetheless, it is undisputed that Amador "sought employment" from Mercer, as the class definition requires, and that Mercer failed to disclose to Amador the availability of $12-per-hour H-2A jobs. Amador's personal narrative is somewhat more colorful, but it falls within the common contours of Plaintiff's theory of liability. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011) ("Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality."). Here, the gravamen of the Inaccurate Information claim is a common omission about the availability of H-2A work paying $12 an hour. The "nature" of Amador's individual claim is thus "reasonably coextensive" with that of the class of local farm workers who

did not receive the benefit of information about H-2A jobs.[12] *Parsons*, 754 F.3d at 685. Moreover, Mercer does not indicate how any differences would "preoccupy" Ruiz Torres or Amador or "threaten to become the focus of the litigation," *Hanon*, 976 F.2d at 508, such that the district court committed a clear error of judgment.

## CONCLUSION

For the foregoing reasons, we hold that the district court did not abuse its discretion by certifying the Inaccurate Information class and the Equal Pay subclass. The district court's class certification order is AFFIRMED.

---

[12] It is possible that Mercer exposed Amador to both a misrepresentation along with a common omission concerning the availability of H-2A jobs. Nonetheless, Mercer fails to raise this particular challenge to typicality and, moreover, the thrust of the misrepresentation essentially overlaps with that of the material omission. Both create the false impression that Mercer was not seeking to hire H-2A workers when he sought employment.